## MARYLAND ADVERTISING CO *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 83, October Term, 1951.]

*Decided February 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Frank B. Ober* and *Alexander Harvey, 2d,* with whom were *Ober, Grimes and Stinson* on the brief, for appellant.

*Francis J. Valle, Assistant City Solicitor of Baltimore City,* with whom were *Thomas N. Biddison, City Solicitor* and *Edwin Harlan, Deputy City Solicitor,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order of the Baltimore City Court affirming a decision of the Board of Munici-

pal and Zoning Appeals. That Board denied an application by the appellant to erect an illuminated poster board on a vacant premises, 2002-10 Aisquith Street in Baltimore City.

The place where the illuminated poster board is sought to be erected is in a Second Commercial Use District where sign boards are not forbidden. Art. 40, Section 6, Baltimore City Code, 1950. The Zoning Commissioner has no discretion in refusing the application. *Mayor and City Council v. Biermann*, 187 Md. 514, 518, 50 A. 2d 804. Article 40, Sec. 37 of the Baltimore City Code, 1950 Edition, provides in part that "Applications for a permit for any of the uses enumerated in Section 36 shall be made to the Zoning Commissioner. No such permit shall be issued until the application shall have been approved by the Board of Municipal and Zoning Appeals * * *." As pointed out in *Mayor and City Council v. Biermann, supra*, the effect of this provision confers original, rather than appellate, jurisdiction on the Board. Among the uses enumerated in Section 36, *supra*, are a filling station and billboards. It provides in part that: "(3). A billboard for the display of outdoor advertising or poster boards; * * * may be permitted, in such a use district * * * only after a public hearing before the Board of Municipal and Zoning Appeals, and compliance with the terms and conditions hereinafter set forth". To meet conditions set out in Section 37 of Article 40, plans and specifications were submitted to the Board of Fire Commissioners, the Commissioner of Health, the Police Department, and the Chief Engineer of the City of Baltimore. Letters of approval were received from all of these by the Board.

The Board conducted a public hearing on February 27, 1951. The testimony showed that the sign was to be 12 feet by 25 feet and the bottom of the sign was to be 8 feet off the ground. The board was to be located on the west side of and facing Aisquith Street, and on leased premises south of a building erected on the property line by the Associated Canners Corporation and

occupied by the Tow Motor Corporation and used in the "lift truck repair business". On the north side of this building appellant already had one poster board of construction similar to the proposed board. At the hearing Mr. George A. Johnson, representing the Tow Motor Corporation, appeared and objected to the erection of the proposed sign because they had a fire door on the side and about the center of the building and also an outlet there to fill their oil burner system. Mr. Albert T. Antlitz, President of the Associated Canners Corporation, owner of the adjoining building, said that his build-was completed about three months before and they "spent considerable sum of money to make a very attractive building. We should have known but let it go by when they put the first sign up. We were out of town and busy and it got by and they erected this sign about equal to the front of the building and put it two feet from our wall. It has a ramp around the base of the sign and all the children in the neighborhood can climb up this pole on to the sign, on to the roof of our building, and that is hazardous as it is. It detracts from the building and now they want to go on the opposite side and we will be encased in two billboards. I don't think it is in order." When asked whether Brockway Motors could put up a building to his property line, he replied: "There would be no objection to a building but why have a building between two signs and the children always on top of our roof". The photographs offered in evidence show that the erection of a building on the leased premises would block off the fire door and oil fill to a much greater degree than the contemplated sign board.

The Board on February 27, 1951, disapproved the application and in its resolution said: "The proposal is to erect one 12' x 25' illuminated poster board at the front of the lot, five feet away from and parallel to the lot line of the adjoining premises known as 2100 Aisquith Street, on which there is a building occupying practically the entire lot. The owner and lessee of the

premises 2100 Aisquith Street were present at the public hearing and testified they objected to the erection of the proposed sign for a number of reasons: That there is a fire door on the side of their building where the sign is proposed to be erected, also an oil fill for the burner system, that there is now a similar sign on the other side of their building two feet from their wall, in the same position as the proposed sign, and that children climb on the existing sign board and go on the roof of their building, which is a hazard, and if the proposed sign is erected they will be encased between two signs. The Board finds the proposed sign would menace the public health, safety, security and morals, and with due consideration to all the evidence contained in the testimony and the record, and to the reports of the several City departments as required by the Zoning Ordinance, the Board disapproves the application."

An appeal was taken to the Baltimore City Court and additional evidence was offered there. Mr. Ferguson, an employee of appellant, testified that the sign would be "about 2 or 2½ feet from the adjoining building on the north". The sign board was to advertise "Blue Sunoco". The fire door of the adjoining building faces an alley. The oil fill is about 45 feet from the front property line and the sign is to extend only 25 feet from the front property line. The board would be "all steel with the exception of four boards on the platform". There would be a wide type storm fence, a protective fence, "no less than 8 feet". When asked how anyone could climb on the sign, he replied: "They would have to be shimmied up the girder or put some instrument there in order to get on the the platform". Mr. Antlitz, who testified before the Board, also testified before the Court. He said that the Associated Canners' building was "pretty" close to the property line. When he testified about children climbing on the sign, the attorney for the appellee admitted that that was not a zoning matter and the judge replied: "I am inclined to agree on that". Mr. Antlitz admitted that the oil fill was 40 or 50 feet back

from the front of the building and could be reached by a hose line. He also admitted that the fire door opened on an alley back of the Brockway property. When asked what were grounds of his objection, he replied: "Primarily, they erected a sign. I had been out of town at the time the original sign was put up. In fact, we had not started the building yet. We had just about started building. They erected a sign on the north side, I am guessing, approximately 2 feet from the building. After it was up we had no argument, we couldn't do anything about it. We had made no argument at the time the permit was granted, so we could do nothing about it, and when our building was completed they put this notice up they were going to erect another sign. They intended to erect it approximately 2 feet from the building, and we would have the building encased between two signs. We spent approximately forty to forty-five thousand dollars on this building. All the buildings in that neighborhood are pretty new, and are going to be new buildings. The Sharp and Dohme have erected a very beautiful building within a block of us. General Delivery has spent, oh, I can't guess how much, a brand new building. Calvert Drug have erected a building costing close to one million dollars. Besides, there are residences. I believe everyone in that neighborhood are attempting to improve its appearance. They are all erecting good, substantial, beautiful buildings." He admitted that all these buildings were commercial and that signs would not hamper their operations, but it was unsightly. He finally said: "We have two objections. We object to the children—they have a platform—and where they make it any easier for people to go up, but other than that we don't want our building encased in two signs * * * the building is attratcive * * *. It would detract from the neighborhood."

The court found: "Where the Board of Municipal and Zoning Appeals has turned down these billboard applications the applicant is in the position of more or less having to bear the burden of proof. Certainly, as

to the production of facts before the Board and argument to the Court on appeal, the applicant has the burden of satisfying the Court not only that the action of the Board was arbitrary and unreasonable, or unlawful, but that the application is one which it would be desidable to grant. It is true that several of the reasons stated by the Board for disapproving the application can be discounted, and shown to be unsubstantial, but it is nevertheless a fact that the man who is objecting would have his building sandwiched in between two large advertising signs. That is clearly objectionable from his standpoint, and I think that fact had a great deal of influence on the Board in rejecting the application. While advertising is a legitimate business, and poster boards which are illuminated is a legitimate form of advertising, yet it can be overdone, and I think a man who has advertising signs up on both margins of his property near the street, has his place completely obscured except for the people who stand directly in front of it, and naturally he objects to it. I think on all the considerations which ought to apply to an appeal like this, that the action of the Board ought to be affirmed."

The finding of the Court was plainly that because of the advertising signs on both sides of the property near the street, the Canners Corporation building would be completely obscured except for the people who stand directly in front of the building. The answer seems to be that buildings on these two vacant lots, within zoning regultions, would have the same effect. It could hardly be argued that such buildings could not be constructed because the Canners Corporation building could not be seen except by the people who stand directly in front of it. None of the objectors finally placed their objections on esthetic grounds. Neither the Board nor the Court based the refusal of this application on esthetic grounds and in this opinion we are not passing upon the esthetic value of sign boards. The finding here was equal to a finding that nothing could be built on the vacant lots adjoining the Canners Corporation build-

ing which would obstruct side views of that building.

As above shown, Sections 36 and 37 which provide for the issuance of permits apply to filling stations as well as billboards. Appellee contends that the following quotation from *Mayor and City Council v. Biermann, supra,* 187 Md. at page 523, 50 A. 2d at page 808, which involved an application for a permit to construct a gasoline filling station, is applicable here: "Considering the action of the Board as an exercise of delegated legislative, or quasi legislative, power, the scope of review is different and in some respects more limited than where the action is quasi judicial; *e.g.,* the court must find that the result of the action is beyond the police power and deprives the applicant of property without due process of law. On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the legislative body acted without evidence at all." It was said in the case of *Chissell v. Mayor and City Council of Baltimore,* 193 Md. 535, 543, 69 A. 2d 53, at page 56: "Strictly legislative action by a legislative body (as distinguished from action, by a body exercising delegated quasi-legislative and quasi-judicial power, which affects private rights in the public interest) is not invalid because it is taken without investigation or public hearing." It was said in *Hoffman v. Mayor and City Council of Baltimore,* 197 Md. 294, 307-308, 79 A. 2d 367, at page 373: "In *Mayor and City Council of Baltimore v. Biermann, supra* [187 Md. 514, 50 A. 2d 808], we held that the property owner has 'the heavy burden' of overcoming the presumption of constitutionality of legislative action in denying application for a filling station permit, and that this presumption attached to minority veto as well as to an unconditional legislative prohibition. We need not consider just how 'heavy' this burden is in other cases as compared with filling station cases. In *Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346, we set aside a refusal of a filling station permit on the verdict of a jury that the refusal was arbitrary, sup-

ported by evidence of acts and statements by the municipal authorities which showed that they had acted not in the public interest, but to please neighbors and without any regard for the rights of the property owner. In *Mayor and City Council of Baltimore v. Byrd,* 191 Md. 632, 62 A. 2d 588, and in *Cassel v. Mayor and City Council of Baltimore,* 195 Md. 348, 73 A. 2d 486, as in *Northwest Merchants' Terminal v. O'Rourke, supra,* we held arbitrary and invalid ordinances amending the Zoning Ordinance."

A zoning statute, ordinance or administrative order, as other actions in the exercise of the police power, is presumed to be valid unless it is shown on its face or by extrinsic facts to be invalid. The mere fact that an exercise of the police power may cause expense or loss does not overcome the presumption of validity. However, the duty of the courts not to substitute their judgment for the judgment of legislative or administrative authorities, acting within their powers, is no more imperative than the power and duty to set aside any purported exercise of such power which is in fact arbitrary, capricious or confiscatory. Zoning in this respect can no more escape judicial review than any other purported exercise of the police power. The legal question here is whether this quasi-legislative and quasi-judicial determination was "an unreasonable, arbitrary, or unequal exercise of power". When it is found that the decision is not founded on the maintenance of the health, safety, security, morals, and general welfare the action will be set aside. It was said by the *Supreme Court of the United States in Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 448, 72 L. Ed. 842: "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." The action here, bearing no such relation, was arbitrary and

invalid, and should be reversed. It was said in *Kublitsky v. Zimnoch*, 196 Md. 504, 508, 77 A. 2d 14, 16: "Building on one's own land is still a property right, subject to all applicable provisions of law; it is not a grant of favor from some governmental authority."

The appellee presents the argument that the right to erect a billboard is restricted to the display of advertising matter relating to the business conducted on the premises and does not include advertising, foreign to such business. It relies on the *Vermont* case of *Kelbro, Inc. v. Myrick*, 113 Vt. 64, 30 A. 2d 527, which quotes from the Philippine Supreme Court. Contrary to this decision is a *Connecticut* case, *Murphy, Inc., et al. v. Town of Westport, et al.*, 131 Conn. 292, 40 A. 2d 177, 156 A. L. R. 568. However, as above stated, the decision in the instant case was not based on esthetic grounds but on the fact that the adjoining building would be closed in on two sides.

*Order reversed, with costs.*